Good morning, and may it please the Court, my name is Natalie Atkinson. I represent the appellant and plaintiff below, Dominique Spatafore in this matter. By granting summary judgment in favor of the City of Clarksburg, the District Court improperly weighed evidence, gave the City the benefit of every reasonable inference, and usurped the role of the jury. The District Court's order on Ms. Spatafore's claims for FMLA retaliation and her West Virginia State claim for disability discrimination must be reversed for three independent reasons. First, the District Court substituted its judgment for that of the jury by deciding genuine disputed issues of material fact. That's not its role on summary judgment. Second, the District Court did not consider Ms. Spatafore's evidence a pretext. Third, the District Court did not consider discrimination as a motivating factor contributing to Ms. Spatafore's discharge. These are all true as to Ms. Spatafore's FMLA claim as well as to her West Virginia Human Rights Act disability claim. To briefly address some of the facts, beginning in 2014, Ms. Spatafore was employed by the City of Clarksburg, West Virginia as a marketing specialist. From 2014 to 2021, she had no disciplinary issues. There's no write-ups in her reports. She was never suspended. She was never placed on an improvement plan. Ms. Spatafore suffers from anorexia and Crohn's disease. In mid-2021, she requested the opportunity to take FMLA leave so that she could seek inpatient residential treatment for her eating disorder. She returned from FMLA leave on September 13th of 2021. Within days of her returning, she was placed on a PIP, or an improvement plan, for the first time in her tenure with the City of Clarksburg. She testified that she's told that if she doesn't meet heightened requirements for her job, she's going to be terminated. She then agrees after discussion with her employer to take a different job, a job that was below her qualifications at the time, as an accounting specialist with the City, which she agreed to do. About three months later, while she's out sick with COVID-19, she's terminated. But in between that, right, there's the social media activity in mid-December? Right, Your Honor. Okay, so I mean, I feel like that's kind of an important piece of the story. It is, and of course, that's what the City will point to and has pointed to as the reason for her termination. And why is that not the most reasonable inference, that the reason she was terminated were the undisputed violations of workplace policy days before the termination and not something that happened months earlier? Sure, a few responses to that, Judge Harris. The City relied on three things that it stated were allegedly the reason for Ms. Spadafore's termination. The first was her failure to follow the City's grievance policy. Ms. Spadafore, as I mentioned, was out sick on COVID-19. Was that, was the grievance... Sorry, I'm just making sure. I want to understand all three things. I just want to make sure I understand. Was the grievance policy about the social media? Was the alleged failure to follow the grievance policy, was that about the social media issue? As I understand it, Your Honor, it was about Ms. Spadafore's complaints for not being paid while her employer required her to be out while she was sick with COVID-19. It's about the email with the COVID grievance to the City Council. Right. Ms. Spadafore gets sick, end of 2021. But it's not, I just want... I think Judge Harris' comment to be about the social media, and that's really about, that's different from the grievance. Correct. Okay. I thought that was right, but I thought in response to her question about social media, you talked about grievance, and so I just wasn't following. Correct, and hopefully I can tie these things together, but two different things. The city says that we're firing you because you posted on Facebook, you put an internal memorandum on Facebook, and because you didn't follow the grievance policy. Grievance policy, or her alleged failure to follow the grievance policy was not related to the Facebook communication. So first, if we take the grievance issue. She was personal friends with the City of Clarksburg's, the mayor of the city's wife at the time. Oh, I was wondering about that. They were friends? Right, they had a personal relationship. So she reaches out to the mayor's wife, who she knows personally, to complain about the city requiring her to be off work because she has COVID-19, but not paying her for it. Can I just ask, because I had the same response that Judge Harris had, where would I look in the record to see that they had a personal relationship? The plaintiff's deposition testimony. That was discussed there. That seemed to be ambiguous to me, but maybe I'll go back and look at that. Because it doesn't seem to match up, the mayor's wife doesn't seem to suggest that there was a personal relationship in the context of what's going on. And I understand we're giving your client the inference, but it's one thing to know them, it's another thing you represent, like there's a personal relationship, they're friends or something. I believe the deposition speaks to that, Your Honor. I don't know if they were close friends, and I don't think they socialized on the weekends necessarily, but at the time, and the record would reflect, the plaintiff, Ms. Spadafore, was having difficulty with her supervisor, the city's manager, who would have been the person that she was grieving to under the policy. And because of those personal conflicts, opted to reach out to the city's mayor, city mayor's wife, excuse me. But there's no dispute that that was a violation of the grievance policy. That was not proper procedure under the grievance policy. We acknowledge that. That happens in December for the second time. She had also reached out to the mayor's wife in October. Again expressing concerns about her employment. The city does... So instead of telling the wife, how about get your husband to effectively, get your husband to do something about this. Right, right. Which is no longer like talking to a friend. It's making a request that the mayor intervene in her employment relationship. Right, and she's asking for the mayor to be alerted to these issues and wants to draw attention to her dissatisfaction with what's going on at work. When that happens in October, the city takes no action at all about it. The city mayor forwards the email from Ms. Spadafore to the city manager. She doesn't get a warning about it. She doesn't get a write up. So I actually, well it doesn't matter, we're not a jury, but I actually thought that could cut both ways, right? It's kind of in its own way a bit of a good fact for the city that they weren't sort of poised to try to come after her as soon as they could after she took leave. Yeah, and I think it's again an inference that could possibly go both ways. When we're at the summary judgment stage, the plaintiff gets the benefits of those inferences. The city took no action though, and that's a fact that's undisputed in the record. And then in December when she does it again, all of a sudden it's grounds not for discipline under the tiered policy that the city endorses, but termination outright without so much of a conversation with Ms. Spadafore. And then when it comes to the Facebook communication, which was the other reason that the city relied on for her termination, Ms. Spadafore's out sick with COVID. The factual background here, the West Virginia governor said all state employees get Christmas Eve off of work, and they also get Christmas off of work. Just so I'm clear, is your argument that she was permitted to do this, or is this like justification for violating the policy? I mean, are we trying to evaluate whether, same thing I was trying to ask with the grievance, right? We all agree that she didn't follow the grievance policy. You have some reasons why that was done. Are we doing the same thing here on Facebook? She wasn't permitted to do this under the employee manual, but your point here is they're extenuating circumstances. Right, and that these are weak or false reasons for jumping to a termination for someone who has never had a problem at work. Again, this is all happening when Ms. Spadafore is out sick with COVID. There's no discussion with her. There's no saying, hey, you don't cut out posting on social media, we're going to suspend you. Nothing like that. She's immediately let go. And when you take the fact that the dissatisfaction with Ms. Spadafore's work starts immediately when she comes back from taking time off for personal illness, and that this escalates, and that again, when she's off work for personal illness, her employer decides to terminate her, again, without taking any less drastic or intervening steps. Our argument before the district court was that a reasonable inference there, particularly with the direct evidence that they discussed her FMLA leave at the time that they were deciding to terminate her, that this creates a reasonable inference under the burden shifting framework. Can I just ask you a question about the framework? You do argue before the district court, and I think here that we should be applying motivating factor causation. But what I didn't see either in the district court papers or in the brief before us is sort of an argument under that standard. When it comes time to make your argument, you're arguing just straight out. It's a jury question. The reasons given were false. The real reason was retaliation. Have you developed an argument that even if that is not true, there's another way of looking at the evidence that would match up with motivating factor causation? Yeah. I mean, I think certainly, Your Honor, when we're developing this evidence in front of the district court, I think it's, in thinking about presenting it to the jury, our preference and the way we would rather present the arguments to the jury is that the plaintiff was terminated for illegitimate reasons. But in our briefing before the district court, we also asked, in the alternative judge, you could reasonably find that Ms. Spadafore's exercise of her right to take FMLA leave was a motivating factor in the decision to terminate her. And the district court just didn't address that at all. Can I follow up on that question? You sort of cite to the regulation, which is, and the cases that adopt this regulation, all of that obviously is like pre-Loper-Bright. And so I'm a little troubled with what we're supposed to do here. We have a case called Fry from 2020 that addresses this a little bit because we have an earlier case, Yashinko, that says that this type of retaliation action falls under A2. The regulation only applies to A1. Maybe there's like a brand X problem pre-Loper-Bright, but we don't have a brand X problem. So it seems like Yashinko tells us we're under A2. The regulation doesn't apply to A2. The motivating factor regulation doesn't apply under A2. And you don't develop any argument for why separate from the regulation, we ought to adopt a motivating factor type of analysis given the sort of language that, you know, by reason of language that cases like Gross and others have required but for a cause. Can you help me sort of like tease through? I know I just gave you a lot and nobody cites to Fry, which seems to sort of lay out this rub. Can you help me understand what I'm supposed to do with that? And what, have you made an argument outside of the like Loper-Bright world that allows us to do what you want us to do? Well, let me turn to Fry now because I think it gives you that guideline. Where Fry says, Yashinko says that the FMLA retaliation analysis goes under A2, but you have subsequent federal administrative regulations that say it falls under A1. And if that's the case, I think the court can reasonably hold differently than Yashinko did. What theory is that? What case would you give me that we can ignore a prior panel precedent? You would have given me, a year ago, you would have given me Brand X. But you can't give me Brand X now, right, post Loper-Bright. Yeah, I would give you Brand X. But you recognize you can't do that, right? Loper-Bright tells you you can't do Brand X. That's what Fry said. I don't know what we're going to do here. Brand X seems like a really difficult question, but it's not a question after Loper. Yeah. Right. So we're, I mean, I think this is the rub that I'm trying to understand. Seems like to me we're bound by Yashinko, at least this panel is. And that sort of puts us in a bucket that I have no argument for you for why this motivating factor analysis applies. Right. I mean, I actually have no idea whether you're right about that as a first principles matter. But the argument you've made seems to be plainly foreclosed in this court. Right. Well, and then the court becomes in the position where the second, third, fifth, seventh, eighth circuits have all said FMLA retaliation falls under A1. You know, then perhaps the question is, does the court take it up on Bonk? There are two different things that you can do there, right? One is you can go to 1 First Street, or two, you can file for on Bonk review. But like, and you know, pre-Loper-Bright, you could like compound on Brand X, but it seems like we're sort of stuck there, right? Right. And you know, what I would ask is for the court to look at Fry's analysis, look at Yashinko, because I think it's fairly clear with the administrative guidance that's come out from Yashinko forward, that A1 is the correct subpart for this, this type of claim, in which motivating factor applies. The cases, Hannah P and otherwise, that adopt this Yashinko divide, that A1 is like fundamentally different from these retaliation cases, which are A2. And I'll just say, it is not obvious to me from a first principles matter that A1 is actually what you want. Maybe you do, I don't actually know. But the point being is that that would require us to like reframe the way we manage FMLA cases, despite a bunch of binding panel precedent. It would require substantive and significant change. I mean, if I could say one more thing, Your Honor. I'm totally interested in this, and with Judge Gregory's permission, if you've got more to help me understand what to do with this, I'm open to it. Yeah, no, I just, Judge Richardson, you don't need me to draw your attention to the statutory language, I suppose, but. Counsel? Counsel? I'm sorry? I have a question for you. Please. Even if you did, as Judge Richardson and Judge Harris talked about the motivating factor, what tribal issue of fact have you developed? I think that's Judge Harris, the essence. What is the tribal issue of fact that it was a retaliatory motive that you've developed? You can't just say, well, she took FMLA and then shortly thereafter. But what tribal fact do you have in that regard that you've developed at this point that you can go further? So, first, Your Honor, I'd draw your attention to the admissions that the city discussed the plaintiff's taking of FMLA leave when they decided to fire her. That's a question that the counsel had as some questions. Yeah, wasn't that just the guy saying, like, I don't want to do anything that violates the FMLA? And counsel's saying, well, the reasons you have given have nothing to do with the leave, so you're not exposed. I don't see how that counts against the city. Well, again, from our perspective, I mean, there's two different inferences that can be drawn from the fact that they're discussing that information. But you need some tribal issues of fact, though. Inference upon inference upon inference is very difficult in terms of you've established a tribal issue of fact. I mean, basically, you would say, well, took the leave, shortly thereafter, she was fired. What's the tribal fact as to connect that to be retaliatory? I mean, did someone say something like, you know, you take one more leave, you're out of here, or I don't like this, you're bothering our operation, I wish I had a healthier person. Those are the kind of things normally. I'm just an example. It doesn't have to be that. But I'm just asking you, what is it? Right. What we would point to and what the plaintiff would testify to is that she's had six to seven years of experience with this employer without a problem. And within three weeks of her returning, her employer sits her down and says, we're going to fire you if you don't... I mean, the whole point of your grievance argument, right, is that she had such conflict with her supervisor that she couldn't talk to them, right? But it all starts after. And at the same time, you want us to believe that, like, she was in a great spot with her supervisor, right? Like, those two can't be... I mean, what am I doing with that? You're exactly right. But the timing, it doesn't start until after she comes back from FMLA leave, when her supervisor sits her down and says, I expect more from you. Here's my expectations. Comply with them or you're out. But didn't he actually share some of his time with her? He did. It doesn't seem like very retaliatory mean-spirited, does it? I mean, that would be evidence that would be presented at trial. Exactly. I mean, it's so... But other things you talk about, you know, communications and timing and things like that, and she was placed on a PIP, things like that. It looked like they went to job-related areas. I mean, what... So, otherwise, you would say that every case would go forward just by saying, took the leave shortly thereafter. She had a PIP and those problems. Therefore, that goes to a trial. No summary judgment. Right? That's what you're telling us? I think with the temporal proximity between the time she returns from leave and when she's placed on a PIP, the fact that she doesn't have any problems earlier, and then the escalation of these issues and the firing when, again, she's out sick, Your Honor, is what we would rely on. Why does it matter that she was out sick? Just because that seems mean? Well, because our position would be that the challenges with her employer start when she is no longer able or available to be at work due to her health issues. I'm sorry, when she's back in August and September, or I thought you were saying it's because she got fired when she was out with COVID? She took FMLA leave, correct, in August and September. So why does it matter that when she was fired, she was out because she was sick with COVID? What we would argue to the jury is that it matters because this is another example of her not being at work because she is sick or unable to work due to a health condition. Go ahead. Something else you wanted to say? No, I got it. You're good, Judge. Thank you. Thank you, counsel. Ms. Durst? Good morning. May it please the Court? My name is Tiffany Durst and I represent the appellee, the defendant below, in the case, the City of Clarksburg. I did want to start off by saying that we believe that the Yashenko analysis should apply to the facts of this case. And applying that analysis, we do not believe that the plaintiff, as Judge Gregory articulated, has presented a triable issue of fact. Can you just answer one question for me? As we stand here today, why did the city fire Ms. Spadafore? Because I counted three different reasons given in your brief. The city fired Ms. Spadafore because she violated the grievance policy. I'm sorry, so that is the email to the city council? It is, Your Honor. Because the process at the time... I got that. So what else? The email to the city council? The Facebook messages. Is that the parts where she posts the memo? And that she made disparaging comments about the city manager on those posts. Okay, okay. So the two posts that include the memo. Yes. And that she had reached out to the mayor's wife. Okay, so sometimes when you say why she was fired, you mention the reaching out to the mayor's wife. Sometimes you don't. Sometimes you mention that the Facebook postings had false statements. Sometimes you don't. I actually have never seen a case where even by the time of the appellate brief, the defendant still can't say consistently why someone was fired. Well, I think the city has been consistent in that it was with regard to the posting... Literally, your brief is inconsistent. On different pages, it says different things. She was fired, Judge Harris, because she made posts on Facebook. Yes. And the internal memo... Did it matter that they were false? Or was it just that they had an internal document? I think it was both. You think? Yes. When you look at the evidence that was developed below, particularly the deposition testimony of the city attorney, there was a discussion with regard to the comments that were posted. One of the falsities was that she had posted regarding the employees not being given Christmas Eve off, which was false. What factually happened was... No, no. I know what happened. So on page 27 of your brief, you say the city has consistently stated that the plaintiff was terminated for two reasons, violating the city's grievance policy by contacting the city council, and then posting an internal city memorandum to Facebook on two, parentheses, two occasions. Nothing about the mayor's wife. But then on page 38, all of a sudden, it's actually because of the mayor's wife. And I guess... Back on 41, we go back to, no, it's only the two things. And I guess, I mean, shifting rationales are, we have said many times, are evidence of pretext. And again, usually, like you see the shifting rationales in discovery, but by the time you get to a litigating position, everyone's clear on what happened. I'm sorry, the defendant is clear on what happened. And it is just hard for me to understand why, if you can't nail this down, even in your brief, that doesn't raise questions. I don't think there's a question of fact with regard to pretext when you look at the evidence that was developed. She posted on Facebook an internal memo, and it doesn't matter whether below they argued, it didn't create harm to the city by posting the internal memo. The fact that it didn't create harm doesn't eliminate the fact that the plaintiff violated policy by posting an internal memo. Plaintiff initially had also argued by posting that memo that she was engaging in protected speech. The district court found that she did not engage in protected speech, and she did not raise that issue on appeal before this honorable court. So the fact is, she posted an internal memo that was not protected speech, and she bypassed the grievance policy by going to... Can I ask about the grievance policy? Because I think maybe I understood it differently, and so I'm curious. I understood the grievance, and I do think your brief sometimes conflates these two ideas, but the actual evidence that was before the district court, as opposed to the arguments here, is that the grievance violation includes both the council letter and the mayor's wife. Like both of those fall into this bucket of the grievance problem, right? And then that's separate from what I'll call the social media problem. And the social media problem includes several aspects about it that are all there. And then when we look at the sort of actual evidence, those are the two buckets. I think you would sometimes say it's three things. I've never understood it as three things. I understand it as two things from the actual record. But I take in part Judge Harris's question to be like, what do I do about the fact that the evidence looks that way, but your brief at various times says two things. Sometimes it says three things. And when it's describing the things, it describes them in quite different ways. I think that the evidence developed below those substantiates the fact that she was terminated for violating the grievance policy, as you said, one bucket. And that includes the email to the city council and included others on that. And reaching out to the mayor's wife in December and asking her directly to reach out to the mayor. So that's the one bucket. That is the evidence for violating the grievance policy. The other bucket of evidence is the violation of the social media policy by posting things on Facebook. And so where would I... So if I wanted to find in the record, am I looking at the letter that was written? I know Falk didn't write the letter. I've forgotten the name of... Richard Marsh, Your Honor.  Am I looking at the Marsh letter? Like, where am I looking if what I'm trying to say is, what is the reason that was given? And is that reason sort of maintained and consistent? I think if you look at Richard Marsh's deposition, Your Honor, because Mr. Marsh was deposed. In this case, the city asserted advice of council and produced that communication and Attorney Marsh was deposed. I mean, in his deposition testimony, I believe he addressed the reasoning behind her termination because it was also at that part where there was questions about, well, you also discussed her FMLA during this time. So there was a discussion between and amongst the city manager and the city attorney. And then the city attorney took the information from that discussion and prepared the termination letter to Ms. Spadafore. But the termination letter doesn't say anything about the grievance policy. It uses insolence and subordination. Do you guys use insolence for violation of workplace policy? Insolence sort of jumped out at me. The city attorney chose to use that phrase, Your Honor, and provided a definition of what he was meaning by the term insolence in the letter. It was rude, disrespectful behavior by the posting of the things on the social media site, making disparaging comments about the city manager. So where do I find the grievance? What I'm calling the grievance bucket, right? The fair to comply with the grievance procedure. Where do I see that in the factual record? The factual record included the employee handbook, which outlines the grievance policy. I don't have any doubt about what the grievance problem was. Where do I see that that was the reason, or a reason, I should say, that she was fighting me? I think in Attorney Marsh's deposition, Your Honor. And your point is, Marsh wrote a letter to show off his vocabulary skills, but the deposition is where we sort of see what the reasons were.  And I take your point of Falk's small vocabulary is not a relevant piece of the question. No, the fact that he didn't know what the term insolence meant, he knew what the fact... I'm not totally sure I know what it means, if I'm honest about it. May I have a sense of what it means? But it seemed like an odd word in this context. I would candidly agree with that statement, Judge Richardson. But I think when you look at the facts supporting the basis for the letter, and what we have to go back and look at is, and I think it goes to the question that Judge Gregory asked, is that Ms. Spadafore requested and was granted FMLA leave in the summer of 2021. And under the employee handbook, she was entitled... Well, she was not entitled. She could request donated leave. That was subject to the approval of the city manager. So the city manager, the same individual who ultimately terminated Ms. Spadafore, gave her permission to seek leave from other employees so she would not have to be off paid leave potentially. So he granted her request to seek donated leave. He even donated leave to her. The entire time that she was off on the FMLA leave, she was paid for her time because she had been given enough donated leave. When she returned, what happens under the handbook is, if you're donated more leave than you need, the donated leave is returned to those who donated it on like a per-rata basis. So the reason that I point this out is that ties into some of her complaints in December when she was off on COVID. She, in the email to the city council and others, said that the leave was taken from her, implying that it was somehow improper to take donated leave from her. And it was not. It was in compliance with the handbook provision. Is this as if it vested in her? Exactly, Judge Gregory. And so there's that information. The other point with regard to the FMLA leave is when she returned in September, she asked to take additional, like longer lunch breaks and work later so she could do some online counseling with regard to the treatment that she had received for the eating disorder. The city accommodated that. There was no issue with her doing that. September 20th rolls around and she's asked as the marketing and community relations specialist, she's asked to make a post on Facebook. And I think it's important that this is an individual who had served in this role and then in December makes posts on social media. She was the marketing and community relations specialist for an extended period of time and was asked to make a post. It was not done so. The city manager- What about this? I take one of your colleagues' argument or sort of maybe implicit in your colleagues' argument is Falk and when Falk is in his deposition, that seems to be the first time that we hear about the social media policy. What do I do with that? I mean, I understand that throughout there's been discussion about she was fired because of the Facebook post, right? The conduct is the same but we don't really hear about the policy until like Falk's deposition. At least that's what I gather was the first time we hear about the policy. Does it matter that connecting the conduct to the policy we don't sort of see until later? I don't believe so because the social media policy was articulated in the handbook and Ms. Spadafore received the handbook and she acknowledged that in her deposition that the policy, and the policy was that if you were identifying if your page identified you as an employee of the city of Clarksburg for instance, you could still make posts but you had to make some kind of disclaimer that you were not making it as an employee of the city. So it wasn't that she was prohibited necessarily from making posts herself. So she was familiar with the social media policy and that testimony was elicited from her during her deposition as well. So she was aware of the policy, the handbook was there, she acknowledged receipt of the handbook. So I think there is evidence in the record that Ms. Spadafore was aware by having received the social media policy that was in the handbook that she was not supposed to do what she did and I don't think that there's any at least dispute from the briefs at the district court level in here and in the argument this morning that she wasn't supposed to have done what she did. I mean... There's no evidence that the policy was ad hoc? No, no, no. It was a written policy that was applied to everybody across the board. Do you, don't feel the need to but I feel like I should give you the opportunity since I gave your colleague the chance, this Fry-Yashinko line, you began by saying you agree Yashinko controls and as does Fry and we're sort of stuck with those under A2 and so we're not doing the sort of regulation motivating factor analysis that your colleague is suggesting. I agree with that, Your Honor. I think that for the case that's pending before this court, I think the Yashinko analysis is what this court should apply in determining whether the district court usurped the province of the jury. We would submit that it did not, that there are no tribal issues of fact with regard... I'm sorry. It's okay, Judge Harris. I just wanted... One issue that your colleague has raised is the departure from the progressive discipline policy that it seems like both the city manager and the city attorney did say in their depositions that generally there's this progressive policy and it was sort of striking to me sort of how this thing moved with lightning speed. I mean, it was like the exact opposite of progressive discipline. She gets terminated for things that happen on December 14th and 15th and by December 16th, they're meeting about firing her and they fire her on the 17th. I never heard of anyone getting fired so fast, particularly by a municipal employer. I think that was the escalation of the conduct because what you have to remember is she reached out to the mayor's wife in October and there was no discipline taken against her. No one even says like, hey, heads up, maybe don't do this. And then she goes to the account clerk position and always quiet on the home front, so to speak, for a couple of months until December. And she's fired on December 16th. And then it is just one thing after another. But over two days. Like, maybe she's having a bad... I guess it's not in the record, but what is your best response to they, both people say in their deposition, we use progressive discipline, we start with coaching, it escalates to warnings and so on. And here, the misconduct is on the 14th and the 15th and by the 16th, they're talking about firing her and they've done it on the 17th. The progressive discipline policy that's articulated in the handbook, it... Well, I don't think the handbook is your problem. It's the deposition testimony. And is there a policy in that? I didn't think there was. Is there a progressive discipline policy in the handbook? There is a progressive discipline policy in the handbook. I believe. I didn't see it either, but then the city manager and the city attorney... I think there is. So this strikes me as like an important difference. I guess I'll look back, but it seems like it's a different story if you have a policy that says, this is what we do as compared to a deposition where they say, this is how we operate. Like this is our practice. If they're violating a policy, right? It would be odd to have a story where they're violating a policy in order to fire somebody for violating a policy. But if instead they're describing, as I took their deposition to be, not a formal policy, but a practice that they typically engage in, that seems like a different line. And so if it's in the employment, if it's in the employee handbook, it seems really problematic for you. And let me rephrase. I don't have the handbook policy in front of me. It says that certain things can lead to termination and the list is inclusive, but not exhaustive. And that's where it talks about insubordination. That is the testimony that attorney Morris was talking about with regard to the insubordination. Because in any context we have, even a progressive discipline policy, presumably there's something that you can do that would get you fired immediately. Exactly. And the insubordination is one of the things in the city's handbook that can lead to immediate termination. That's articulated in the handbook. And that was articulated in the brief. Does it say immediate? I don't know if it's, I don't know that it says immediate. But it says that it can lead to termination. Well, of course, I mean... And here... Well, in this case, does the plaintiff assert there's a provision in there that you violated? I'm sorry, Judge Gregory? Does the plaintiff assert there's a provision in writing that you violated? That I am not... That's the, you know, the plaintiff would have to bring forth on that. No, there's... You don't have to load your gun, put bullets in the gun for somebody else. I don't see it. I'll just tell you, I don't see it. Maybe I'm mistaken about this. In preparing for this last night and reading the briefs again and the record, there is no argument by the plaintiff that the city violated any provision of the employee handbook. Right, but your colleague does argue both people testified normally, this is how we do it, and they didn't do that here. And we do have cases that say departing from a practice in how you usually discipline people can give rise to an inference that there's something else going on here. It can give rise to an inference, Judge Harris, but when you look at all the evidence in the case, we believe that the evidence does not establish a pretext. And when you look at the... The evidence doesn't have to establish it yet, right? The question is, does this go to a jury or not? Well, and I don't believe that there's any issue of tribal fact that the plaintiff has established in the record that would get this to the jury question of whether there's a pretext. If I were going to try to make the other argument, like as quickly as possible, it would be like, look, seven years she's working for this city, no problems. She goes on leave, immediately after she returns, she is told for the first time, actually, there's a whole host of workplace problems. We're putting you on an improvement plan. And then according to her deposition, which I think we credit for now, they effectively force her out of her job. So that happens as soon as she gets back from leave. And then a couple of months later, she is fired with lightning speed and with no effort to engage with her in the way that both the city manager and the city attorney attest is their normal practice. There's no effort to do any of that. And to this day, the city can't give a straight answer as to why she was fired. How does that not get you to a jury? A couple of points on that, Judge Harris. With regard to placing her on the performance improvement plan after she came back from leave. What happened factually was when she didn't make the Facebook or the social media posts as requested by the city manager, she requested a meeting to outline her duties. So it wasn't that... But she is told at that meeting, and shoot, I don't have it in front of me, but we have problems with your work. You don't do stuff on time. There was another thing. And according to her, this is the first she's ever hearing about this. And that's part of the argument that the plaintiff made in the underlying record that there were no issues at all. And that's just not true. There weren't a lot of issues, I candidly admit, but she was written up or given a verbal warning. And obviously we know the only way you can document a verbal warning is to put something in writing. There were emails from January and February of 2021 with regard to not calling off work properly and some taking longer lunch breaks. I think there are also some other emails in the record, but I can't point you to those at this point in time. But so the argument that there was no issue at all is not true. So she is asked to make a post. And remember, this is her job. She's supposed to make posts. The evidence is not developed in the record that her job duties were heightened or there were somehow things that were added to her job during that meeting. She was told what the expectation of doing her job was by the city manager that she was expected to make so many social media posts and do so many things. And her response was, I don't think I'm going to be able to fulfill these obligations. At that point, if the city had terminated her, I think the plaintiff would have a better argument that they terminated her because she just came back from leave. But the city didn't do that. The city gave her another opportunity because she couldn't do the job duties that were being asked of her. So she moved into another position. And then she was fine in that position until she started these things in December. So I think that the evidence developed in the record below does not... We would submit that there was not a prima facie case of retaliation in the first place. The district court assumed that. And then moved to the other, the burden shifting analysis. At a minimum, we think the record is sufficient to establish that there was no protectural reason that Ms. Spadafore was terminated for the insolence and the insubordination for violating the grievance policy and for posting things on social media when she was not supposed to do so. And for those reasons, we believe that the summary judgment order should be affirmed. Thank you, Ms. Durst. Thank you. Ms. Atkinson. I'm sorry to ambush you, but I want to start with a factual question. Please. So when I look at your brief, you cite for the progressive discipline point, you cite the JA 275, which is part of the handbook. I read that and it doesn't say anything about being a progressive discipline. Where is it that I would find in the joint appendix, that the site that you give me, where would I find the progressive discipline, like quote unquote policy? I know you talk about it a lot, but the only site I see is JA 275. And hypothetically for me, except that that doesn't say that there's a progressive discipline policy. Where else might I look to find it? So two things, you're in the right place in that 275 to 280 detailed the various levels of discipline that the city can use when disciplining an employee. This was raised with my colleague and I acknowledge that there's nothing in this policy that says the city has to go from step one to step two to step three, starting with a verbal reprimand written reprimand and moving up towards suspension and ultimately termination if that's appropriate. That's not mandatory under this policy. But you clearly have laid out here these various levels of discipline and the city manager and the attorney are testifying. This is how we implement this policy. So tell me where am I looking for that? I mean, just ballpark, I don't need like a literal quote, but like, we're in the JA. I just would love to like flip to it while I was like trying to figure it out. He testifies that in his experience as city manager, when an employee commits misconduct, he's... Anyway, that's okay. I'll try to find it. But what we're really looking at is whatever his testimony is. His testimony that in practice, the city, when they find it, it's appropriate starts with the least restrictive or least severe means of disciplining an employee. And that's what's difficult from the employee's perspective when the city comes back and says, we can do essentially whatever we want when it comes to employee discipline. But it didn't say that in this case. You know, in this case, I mean, in this case, you had a PIP, didn't you? Didn't that give some indication of their culture in a sense? Didn't she have a PIP? She did. Is that progressive discipline? Isn't that one of the primary, I mean, very stellar aspect of progressive discipline, isn't it? That's the best you can have. That is, rather than hit you with a hammer, we're going to lay out a plan to improve you. I'm just asking you. I don't think that the personal improvement plan in this case identified issues with employee misconduct. Well, I'm talking about you saying these inferences that they don't help people and that they just, you know, but wouldn't that be evidence that they don't do that? They say, listen, let's work. Let's try to help you. Let's point where your deficiencies are, the weaknesses are, and let's have a plan for improvement. I mean, you can't have it both ways. You say, oh, because you were fired, it means you're just, no, but you got to look at what happened along the way, right? And what they're saying is that there were problems, right? And then, and her job was posting, right, Facebook stuff. So therefore, hers was, that was, you know, she has a voice on Facebook, right? And so it's very helpful not to distinguish when the voice is not the voice of the company, doesn't it? She did. I mean, she wasn't the managing specialist at the time she posted. But she posted, right? Didn't she, for the company? She posted her concerns on Facebook. No, I'm not, I'm talking about  Yes, yes, that was, that was part of her job before she was moved down to a county. So I'm almost out of time, Your Honor, just to reinforce the point that the city issues this letter through its attorney to Ms. Spadafore, identifying the supposed reasons for her termination, insolence, insubordination, posting of internal documents. The evidence of records suggests the city manager who is responsible for the termination decision can't precisely identify what that means. And we know from this court's precedents that changing reasons, nebulous reasons are evidence of pretext. We don't, we don't fault, fault for not having a vocabulary that includes a word that like is not commonly used. Insolence. No, I don't fault him for that, Your Honor. But he, but he could not tie what Ms. Spadafore had allegedly done But you asked him like, what did she do this incident? He's like, I don't know what that word means. So I can't possibly answer that question, right? Like that, I don't, I guess you just went to that. I'm like, you have lots of good arguments. That seems like a bad one. Right. I appreciate you pointing that out for me, Judge Richardson. But again, the city policy identifies what insubordination means. It means failure to follow an order. He couldn't identify how Ms. Spadafore followed failed to follow an order. The city goes from zero to 100 and deciding to let her go while she's out with COVID.  while my colleague asked the court, like the district court to draw inferences and inferences in the city's favor. It's not appropriate at the summary judgment stage. Ms. Spadafore has presented genuine issues of material fact on these claims. We ask the court to reverse the decision of the district court. Thank you, counsel. Thank you. Thank you both. We'll come down and greet you and then we'll proceed to our next case.
judges: Roger L. Gregory, Pamela A. Harris, Julius N. Richardson